# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TENNESSEE
### WESTERN DIVISION

| | | |
|---|---|---|
| TINA NELSON, individually and on behalf of a class of similarly situated individuals, | ) ) ) | Case No. |
| *Plaintiff,* | ) ) | |
| v. | ) ) ) | COMPLAINT – CLASS ACTION |
| FORD MOTOR CO., a Delaware corporation, | ) ) | JURY DEMAND |
| *Defendant.* | ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiff, Tina Nelson, brings this class action suit against Defendant, Ford Motor Company ("Defendant" or "Ford"), on her own behalf and on behalf of a class of other individuals who purchased Ford F-150 vehicles manufactured and/or sold by Defendant. Plaintiff brings this action to obtain relief for the serious defect in the vehicles' paint and/or paint primer ("Primer Defect") as well as the recurring defect in the vehicles' aluminum body panels exposing them to premature corrosion ("the Corrosion Defect") (together, the "Defects"), both of which cause significant damage to the vehicles' overlaying exterior paint. Despite having knowledge of the Defects for years, Defendant has failed to disclose them to consumers and has refused to provide necessary repairs to F-150 owners who have experienced the Defects' effects on their vehicles. Plaintiff alleges as follows upon personal knowledge as to herself and her own acts and experiences, and as to all other matters, upon information and belief, including an investigation conducted by her attorneys.

## JURISDICTION AND VENUE

1.     This Court has diversity jurisdiction under 28 U.S.C. § 1332(a) and (d), because (1) at least one member of the putative class is a citizen of a state different from the Defendant, (2) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (3) none of the exceptions under that subsection apply to the instant action.

2.     This Court has personal jurisdiction over Defendant because Defendant has ongoing and systematic contacts with the state of Tennessee, and conducts business in this District.

3.     Venue is proper in this District because Defendant transacts business in this District and because a substantial part of the events or omissions giving rise to the claims occurred within this District.

## PARTIES

4.     Plaintiff Tina Nelson is a natural person and a citizen of the state of Tennessee.

5.     Defendant, Ford Motor Co., is a Delaware corporation with its principal place of business in Dearborn, Michigan. Defendant designs, manufacturers, markets, distributes, supplies, services, repairs, sells, and leases passenger vehicles under the Ford F-150 brand, including the class of vehicle purchased by Plaintiff, throughout the country and in this District.

## FACTUAL ALLEGATIONS

6.     Defendant has produced the popular Ford F-150 pickup truck since the 1975 model year.

7.     Historically, Defendant's Ford F-150 marketing materials and brochures have touted the model's durability. For example, Defendant's 2014 F-150 marketing brochure repeats its brand motto: "Built Ford Tough."

8.     While for many years Defendant's F-150s were manufactured using steel bodies, in the early 2000s Defendant chose to incorporate aluminum body panels in its F-150s and other Ford-brand models.

9.     What Defendant has failed to communicate to prospective Ford F-150 buyers, however, is that its decision to move to lighter vehicle frames incorporating lighter body panels has come at a significant cost to F-150 purchasers.

***Defendant's Unresolved Aluminum Body Panel Corrosion***

10.     Upon information and belief, Defendant began installing aluminum hood panels in its Ford F-150s in 2004.

11.     Defendant replaced heavier steel hoods – the section of the frame covering the engine – with lighter aluminum panels in order to reduce vehicle weight and increase fuel efficiency.

12.     However, Defendant's aluminum hoods carry an inherent, latent defect: they quickly corrode and cause damage to the F-150's overlaying paint layer.

13.     Defendant has been aware of this Corrosion Defect for over a decade. Since 2004, Defendant has issued numerous Technical Service Bulletins ("TSBs") – which are recommended steps and procedures for repairing its vehicles – identifying to its service technicians the aluminum panels as a source of corrosion. For example, on December 27, 2004, Defendant issued TSB 04-25-1 ("2004 TSB"), applicable to 2004 model F-150s. In the 2004 TSB, Defendant stated:

> Some vehicles may exhibit a bubbling or blistering under the paint on aluminum body parts. This is due to iron contamination of the aluminum panel . . . Ford's Scientific Research Laboratory has performed a number of tests on vehicle body parts returned for corrosion related concerns. Testing has revealed that the aluminum corrosion was caused by iron particles working their way into the aluminum body party, prior to it being painted.

14.     Less than two years later, on December 11, 2006, Defendant reissued this same warning about the Corrosion Defect to its service technicians in TSB 06-25-15 ("2006 TSB") – titled "ALUMINUM BODY PANELS—CORROSION—SERVICE TIP" – which applied to Ford F-150s from model years 2004–2007. Defendant intended for the 2006 TSB to supersede the 2004 TSB, and repeated the same concerns about the Corrosion Defect:

> Ford's Scientific Research Laboratory has performed a number of tests on vehicle body parts returned for corrosion related concerns. Testing has revealed that the aluminum corrosion was caused by iron particles working their way into the aluminum body part, prior to it being painted.

15.     Ten years later, Defendant still had not developed an answer for the Corrosion Defect. On February 26, 2016, Defendant issued a *third* TSB on the same problem. TSB 16-0028 ("2016 TSB") – titled "Aluminum Panel Corrosion" – covered Ford F-150s from model years 2004-2016:

> **ISSUE**
> Some 2000 and newer Ford, Lincoln and Mercury vehicles equipped with aluminum body panels may exhibit corrosion concerns appearing as bubbled and/or peeling paint with or without accompanying white dust. Panel replacement is not required.

16.     On August 23, 2017, Defendant issued its *fourth* bulletin on the same issue – TSB 17-0062 ("2017 TSB") – which covered 2002-2017 F-150s. The 2017 TSB finally directed Ford repair technicians to replace the entire corroding aluminum panel.

17.     Defendant's corroding aluminum problem and the Corrosion Defect remain unresolved. Just this year, on February 6, 2019, Defendant issued its most recent (its *fifth*) TSB addressing the Corrosion Defect – TSB 17-0062 ("2019 TSB"), covering 2004-2018 F-150s – which supersedes all prior TSBs on the issue and repeats almost verbatim the same concerns from the 2004 TSB:

**Issue**: Some 2000 and newer Ford, Lincoln and Mercury vehicles equipped with aluminum body panels may exhibit corrosion concerns appearing as bubbled and/or peeling paint with or without accompanying white dust. Panel replacement is recommended.

18.     Though the multiple TSBs clearly evidence Defendant's knowledge that its F-150 model is plagued by the Corrosion Defect, Defendant has continued to market, distribute, and sell vehicles containing aluminum body panels vulnerable to the Corrosion Defect.

### *Consumer Paint Defect Complaints*

19.     While the Corrosion Defect causes F-150 hoods to deteriorate, paint-flaking due to the Primer Defect affects other body panels.

20.     For years, F-150 owners have complained about unexplained paint-peeling afflicting their vehicles' roof sections, side panels, and other truck body components:



(https://www.carcomplaints.com/Ford/F-150/2008/body_paint/paint_peeling.shtml)



(https://www.f150forum.com/f118/paint-peeling-off-roof-348703/)



(https://www.f150forum.com/f118/2015-f-150-paint-peeling-452664/)



(https://www.f150forum.com/f118/2015-f-150-paint-peeling-452664/)



(https://www.f150forum.com/f38/paint-peeling-tailgate-439434/)

21.     The complaints featured above are a small sample of the unexplained paint-peeling complaints filling the pages of online forums dedicated to F-150 ownership.

22.     The purchaser of an automobile has a reasonable expectation that, absent some sort of collision or extreme "Act of God" event, the paint on his or her vehicle, especially that of a

vehicle marketed as a heavy-duty pickup truck, will generally last longer than a few years or 50,000 miles.

23.     During the pre-release designing, manufacturing, engineering, and testing of its F-150s, Defendant necessarily would have gained comprehensive and exclusive knowledge about the vehicles' paint; the types and properties of materials used to make the paint and primer, including their durability and whether those materials would weaken over time regardless of wear and use; and the cumulative and specific impacts on the paint caused by wear and use, the passage of time, and environmental factors.

24.     An adequate pre-release analysis of the paint and paint primer used for its F-150's would have revealed to Defendant that the primer and/or paint was insufficiently durable for the F-150's intended use or was otherwise defective, and would not likely last the useful life of the vehicle. Thus, during the pre-release design stage of its F-150s, Defendant knew or should have known that the paint and paint primer it chose for its F-150s was defective, and such knowledge was further confirmed with significant public complaints.

25.     Defendant also knew or should have known about these paint defects because, upon information and belief, numerous consumer complaints about F-150 paint-peeling have been made directly to Defendant. The number of complaints, and the consistency of their descriptions of the paint defects, alerted, or in the exercise of reasonable diligence should have alerted, Defendant to the Primer Defect and associated paint peeling which has affected its F-150s.

26.     The full universe of complaints made directly to Defendant about the Primer Defect and its effects on paint peeling in its F-150s is information presently in the exclusive custody and control of Defendant and is not yet available to Plaintiff prior to discovery. However, as set forth

above, publicly-available information reveals that many F-150 owners have complained directly to Defendant or Ford dealerships about the paint and/or primer defects their vehicles experienced.

27.     Instead of accepting responsibility for the latent Primer Defect and associated paint peeling present in its F-150s, Defendant has turned its back on customers, including Plaintiff, and Defendant has denied all responsibility for the resulting damage caused to Plaintiff's vehicle. Defendant has not disclosed the Primer Defect, has not publicly acknowledged its existence, and has not taken any reasonable steps to rectify the situation.

### *Defendant's Warranties*

28.     As with Defendant's other vehicles, each new Ford F-150 comes with a "New Vehicle Limited Warranty" that provides bumper-to-bumper coverage for a period of 36 months or 36,000 miles, whichever occurs earlier.

29.     Defendant's new vehicle warranty contains a two-year extended coverage provision for defects relating to body panel corrosion ("Extended Corrosion Warranty"), but Defendant has purposefully limited coverage so that it applies only if a body panel "perforates," which means that it corrodes through completely:

> Your vehicles' body sheet metal panels are covered for an extended Corrosion Coverage Period, which lasts for five years, regardless of miles driven. The extended warranty coverage **only applies if a body sheet metal panel becomes perforated** due to corrosion during normal use due to a manufacturing defect in factory-supplied materials or factory workmanship.

(emphasis added).

30.     However, the problem with Defendant's Extended Corrosion Warranty is that it is *impossible* for aluminum body panels to perforate—a fact known to Defendant for years.

31.     Indeed, in 2013 and 2014 Defendant's representatives provided deposition testimony in litigation concerning several Ford Mustang models – which also contain aluminum

body panels – that, although they were aware that Ford's aluminim body panels experience corrosion, they had never seen Ford aluminum body panel perforate through completely.

32.    Even though Defendant knew in 2013, and likely much earlier given the several TSBs addressing aluminum corrosion, that its Extended Corrosion Warranty could never actually be invoked, it did not revise its corrosion warranty until 2016.

33.    For model years after 2016, Defendant's corrosion warranty was revised to specifically address aluminum corrosion, and now states:

> Your vehicle's body sheet metal panels are covered for an extended Corrosion Coverage Period, which lasts for five years, regardless of miles driven. The extended warranty coverage only applies if a body sheet metal panel becomes perforated due to corrosion during normal use due to a manufacturing defect in factory-supplied materials or factory workmanship. **If aluminum body panels have corrosion or rust damage, and the damage is not the result of abnormal usage, vehicle accident, customer actions and/or extreme environmental conditions, the corrosion or rust damage repairs are covered for 5 years, unlimited miles.**

(emphasis added).

34.    However, as described above, despite the 2016 revision to its corrosion warranty, Defendant continues to deny corrosion warranty claims for 2015-and-earlier model Ford vehicles.

## FACTS SPECIFIC TO PLAINTIFF

35.    Plaintiff is the owner of a 2014 Ford F-150 Supercrew she purchased in 2016 for approximately $24,000 (VIN: 1FTFW1CF4EKD66649).

36.    In 2018, while her vehicle had logged less than 40,000 miles, Plaintiff began experiencing severe paint peeling and corrosion affecting her vehicle's body panels, including her vehicle's hood, roof, and side panels:









37.     On January 3, 2019, shortly after she discovered the above-pictured damage, Plaintiff brought her F-150 to an authorized Ford dealership – Reynolds Ford in Norman, Oklahoma – in order to have her vehicle repaired.

38.     Reynold's Ford's repair technician determined that Plaintiff's F-150 was suffering from the Primer Defect, but Ford's representative refused to provide assistance.[1] Specifically, Defendant's representative asked: "Does the dealer feel that this is a defect in the paint?" The repair technician replied: "It is probably a defect in the primer. The paint doesn't appear to have adhered to it." (Ex. A at 2).

39.     Without explaining why, Defendant's representative simply concluded that "FMC [Defendant] will not be able to provide FLP assistance. No assistance can be provided in this case." (*Id.*).

---

[1] A copy of the Ford case record regarding Plaintiff's attempt to have her vehicle repaired at Reynold's Ford is attached hereto as Exhibit A.

40.     Even though Plaintiff's F-150 was still within Defendant's 5-year Extended Corrosion Warranty, which began running on July 7, 2014, Defendant's representatives failed to provide any warranty assistance regarding damage caused by the Defects.

41.     The paint bubbling, peeling, corrosion, and other damages caused to Plaintiff's vehicle by the Defects have resulted in a significant decrease in its resale value and, as more underlying structural components are uncovered, exposed Plaintiff's F-150 to moisture and other environmental conditions. Further, the decreased value, and the money needed to even attempt to remedy the problem, is greater than simply the cost of a new paint job, because the underlying Corrosion Defect in the aluminum hood would cause any new paint to bubble and flake as well.

42.     The damage to Plaintiff's F-150 due to the Defects will only worsen, as the paint peeling and corrosion have exposed Plaintiff's F-150 underlying structural components to the elements, which will lead to rust and further weakening of the F-150's structural underbody.

43.     Plaintiff would not have purchased her Ford F-150, or would have paid significantly less for it, had she known that it contained the Defects and would suffer from significant and premature rust, corrosion, and paint damage.

## **CLASS ACTION ALLEGATIONS**

44.     Plaintiff brings this action as a class action pursuant to Rule 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure. Plaintiff brings this action individually and on behalf of all similarly situated persons as the Court may determine to be appropriate for class certification treatment, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b). Plaintiff seeks to represent the following national class ("Class") and a Tennessee subclass ("Subclass") defined as follows:

> The Class: All persons in the United States and its territories who within the applicable statute of limitations period, and as shown by Defendant's records, purchased or leased a new or used Ford F-150.

The Tennessee Subclass: All Tennessee residents who, within the applicable statute of limitations period, and as shown by Defendant's records, purchased or leased a new or used Ford F-150.

45.     Plaintiff's claims are typical of those of the other Class and Subclass members. If each Class and Subclass member were to bring their claims in a separate, individual action, such individual claims would require proof of many of the same facts, would seek the same relief, and would rely upon the same theories of recovery.

46.     Plaintiff will fairly and adequately represent the interests of the other members of the Class and Subclass. Plaintiff's counsel has substantial experience prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to zealously prosecuting this action on behalf of the other Class and Subclass members and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Class or Subclass.

47.     Absent this suit proceeding as a class action, most members of the Class and Subclass would find the cost of litigating their individual claims to be prohibitively expensive and would not be able to obtain any effective remedy for their damages. Treating common questions of law and fact on a class wide basis is superior to multiple individual actions because doing so would conserve the courts' resources, as well as the resources of the parties, and would promote consistency and efficiency of adjudication.

48.     Defendant has acted and failed to act on grounds applicable to both Plaintiff and the other members of the Class and Subclass, necessitating the imposition of uniform relief to ensure compatible standards of conduct toward the members of the Class and Subclass, and making injunctive or corresponding declaratory relief appropriate for the Class and Subclass as a whole.

49.     The factual and legal bases of Defendant's liability to Plaintiff and to the other members of the Class and Subclass are the same, causing injury to Plaintiff and to all of the other members of the Class and Subclass. Plaintiff and the other members of the Class and Subclass have all suffered harm and damages due to the unlawful and wrongful conduct of Defendant.

50.     Ford brand vehicles are some of the most popular vehicles sold in the United States, and the Ford F-150 (Plaintiff's model vehicle) is one of Defendant's flagship models. Defendant sells thousands of Ford F-150s every month, and upon information and belief, there are tens of thousands of members of the Class and at least hundreds of members of the Subclass, such that joinder of all members is impracticable.

51.     There are many questions of law and fact common to the claims of Plaintiff and the other members of the Class and Subclass, and those questions predominate over any questions that may affect individual members of the Class and Subclass. Common questions for the Class and Subclass include, but are not limited to, the following:

(a) Did Defendant manufacture, distribute, supply, market, and/or sell Ford F-150 vehicles?

(b) Was there a latent Corrosion Defect in the aluminum body panels contained in the Ford F-150s manufactured, distributed, supplied, marketed, and/or sold by Defendant?

(c) Was there a latent Primer Defect in the exterior paint applied to the F-150s manufactured, distributed, supplied, marketed, and/or sold by Defendant?

(d) Did Defendant warrant or otherwise represent that its vehicles would be free from the Corrosion Defect and/or Primer Defect experienced by the Class and Subclass members?

(e) Did Defendant continue to manufacture, market, distribute, supply, and sell vehicles with the Corrosion Defect and Primer Defect even after becoming aware of such defects?

(f) Does the presence of the Corrosion Defect and/or Primer Defect constitute a breach of warranty?

16

(g) Are Plaintiff and the other Class and Subclass members entitled to monetary, restitutionary, and/or injunctive relief or other remedies, and, if so, what should be the nature of such remedies?

**COUNT I: Violation of 15 U.S.C. § 2301, *et seq.* (the Magnuson-Moss Warranty Act)**
**(on behalf of Plaintiff and the Class and Subclass)**

52.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

53.     Plaintiff and the other Class and Subclass members are "consumers" within the meaning of 15 U.S.C. § 2301(3).

54.     Defendant is a "supplier" and "warrantor" within the meanings of sections 15 U.S.C. § 2301(4)-(5).

55.     The defective Ford F-150 vehicles are "consumer products" within the meaning of 15 U.S.C. § 2301(1).

56.     A consumer damaged by a warrantor's noncompliance with a written or implied warranty has a cause of action pursuant to 15 U.S.C. § 2310(d)(1).

57.     Each Ford F-150 vehicle purchased by the Class and Subclass members came, as a matter of law, with an implied warranty of merchantability such that each vehicle was warranted to be of merchantable quality such that it would pass without objection in the trade and would be fit for the ordinary purposes for which it is to be used.

58.     Plaintiff and the other Class and Subclass members each contracted with Defendant to purchase Ford F-150 vehicles, and the purchase price paid by Plaintiff and the Class and Subclass members constituted substantial consideration for the vehicles.

59.     In connection with the purchase or lease of the defective Ford F-150, and as detailed above, Defendant provided Plaintiff and the Class and Subclass members with a "New Vehicle

Limited Warranty" covering defects in materials and workmanship of the Ford F-150 for three years or 36,000 miles, and an Extended Corrosion Warranty covering corrosion damage relating to such defects for a period of two additional years, both of which are covered under 15 U.S.C. §2301(6).

60.     Defendant breached its warranties, as described in more detail herein, and is therefore liable to Plaintiff and Class and Subclass members pursuant to 15 U.S.C. §2310(d)(1). Without limitation, the Ford F-150 vehicles share common design and/or manufacturing Defects in that the vehicles are defectively designed and built with a propensity to cause their body to prematurely corrode and their exterior paint to bubble, flake, peel, and/or rust.

61.     The problem with Defendant's Extended Corrosion Warranty is that it is impossible for aluminum body panels to perforate—a fact known to Defendant for years.

62.     At the time of sale, Defendant knew of the Defects, knew that Defendant's Ford F-150 vehicles were unfit for driving, and given the substantial and material alterations to the vehicles' appearance and significant risk of corrosion and damage to the body of the vehicle, Defendant knew such vehicles were materially different and inferior than the vehicles consumers believed they had purchased.

63.     Defendant's breach of warranty deprived Plaintiff and the Class and Subclass members of the benefit of their bargain with Defendant, as the quality, durability and appearance of the vehicles' aluminum hood and other body panels, along with the vehicles' ability to withstand corrosion and other damages, were material to their purchasing decisions.

64.     In its capacity as a warrantor, Defendant had knowledge of the inherent Defects in its Ford F-150 vehicles.

65.     Defendant failed to effectively remedy the breach as to Plaintiff and, despite being aware of the Defects, and despite being informed of the Defects' effects by numerous other Class and Subclass members, Defendant has failed to provide any reasonable remedy. Under these circumstances, any requirement for other Class and Subclass members to provide Defendant any further reasonable opportunity to cure its breaches of its written or implied warranties should be deemed satisfied and fully excused.

66.     Under 15 U.S.C. § 2310(e), notice of breach of warranty need not be provided until after Plaintiff has been appointed Class Representative. As a proximate and foreseeable result of Defendant's breach of warranty, Plaintiff and the Class members have and/or will sustain damages and loss. These damages include, inter alia: the decrease in resale value of their vehicles resulting from the Defects, including color fading, peeling/delamination, and increased rust and corrosion; expectation damages as a result of Plaintiff and the Class and Subclass members having been denied the benefit of the bargain they agreed to with Defendant; and any further monetary or other damages that Plaintiff and the Class and Subclass members have incurred and/or will incur in order to effectively remedy their vehicles' aluminum hood-related problems.

67.     The amount in controversy of Plaintiff's individual claims meets or exceeds $25 in value, and the total sum or value of all claims to be determined in this class action meets or exceeds $50,000 (not including interest and costs).

68.     Given the latent nature of the Corrosion Defect and Defendant's concealment of the defect, any limitations period that would otherwise bar the claims of Plaintiff or the other Class or Subclass members should be tolled. Additionally, Plaintiff and the Class and Subclass members continue to suffer a violation of their legally protected interests each day that Defendant fails to remedy the defect and make them whole.

## COUNT II: Breach of Implied Warranty of Merchantability
### (on behalf of Plaintiff and the Class and Subclass)

69.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

70.     Plaintiff and the other Class and Subclass members each contracted with Defendant, through its dealer-agents and its related entities, to purchase Ford F-150 vehicles, and the purchase price paid by Plaintiff and the Class and Subclass members constituted substantial consideration for the vehicles.

71.     The Ford F-150 vehicles purchased by Plaintiff and the Class and Subclass members contained the inherent, latent Corrosion Defect that existed at the time the vehicles left the hands of Defendant.

72.     Defendant breached the implied warranty of merchantability that was provided by Defendant to each vehicle owner, as the Ford F-150 vehicles purchased by Plaintiff and the other Class and Subclass members were not fit for the ordinary purposes for which they were to be used. The purchased vehicles were objectively unreasonable and would not pass inspection as conforming goods within the trade, because at the time of sale they had defective aluminum hoods that quickly corrode and cause their overlaying paint layer to bubble, peel, and/or blister, and will cause rust and corrosion, during the lifetime of the vehicle. Further, the purchased vehicles contained defective paint and/or primer applications causing premature damage to the vehicles' exterior paint.

73.     The Defects in Defendant's Ford F-150 vehicles are the direct and proximate cause of the damages and losses incurred, and/or to be incurred, by Plaintiff and the other Class and Subclass members in an amount to be determined at trial. These damages include, inter alia: the decrease in resale value of the vehicles resulting from the Defects, increased rust and corrosion

and the paint layer bubbling, peeling, and/or blistering; expectation damages as a result of Plaintiff and the Class and Subclass members being denied the benefit of the bargain they agreed to with Defendant; and any further monetary or other damages that Plaintiff and the Class and Subclass members have incurred and/or will incur in order to effectively remedy their vehicles' problems related to the Defects.

74.     Given the latent nature of the Defects and Defendant's concealment of the defect, any limitations period that would otherwise bar the claims of Plaintiff or the other Class and Subclass members should be tolled. Additionally, Plaintiff and the Class and Subclass members continue to suffer a violation of their legally protected interests each day that Defendant fails to remedy the defect and make them whole.

**COUNT III: Breach of Express Warranty**
**(on behalf of Plaintiff and the Class and Subclass)**

75.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

76.     In connection with the purchase or lease of Plaintiff's and the Class and Subclass members' Ford F-150s, as detailed above, Defendant provided Plaintiff and the Class and Subclass members with a warranty covering defects in material and workmanship for three years or 36,000 miles, and an extended warranty covering corrosion damage relating to such defects for two additional years.

77.     Defendant's warranties were a basis of the bargain reached when Plaintiff and the Class and Subclass members purchased or leased their Ford F-150s.

78.     Defendant breached its express warranties by (a) knowingly providing Plaintiff and the Class and Subclass members with Ford F-150s that Defendant knew contained the Defects; (b) failing to repair or replace Plaintiff's and the Class and Subclass members' Ford F-150s at no cost

21

within the warranty; (c) ignoring and denying warranty claims in bad faith; and (d) supplying products and materials that failed to conform to Defendant's representations.

79.     Plaintiff and the Class and Subclass members have given Defendant several years of reasonable opportunity to cure its breaches of express warranty, or else were not required to do so because any such opportunity to cure would be futile.

80.     These damages include, inter alia: the decrease in resale value of the vehicles resulting from the Defects, increased rust and corrosion and the paint layer bubbling, peeling, and/or blistering; expectation damages as a result of Plaintiff and the Class and Subclass members being denied the benefit of the bargain they agreed to with Defendant; and any further monetary or other damages that Plaintiff and the Class and Subclass members have incurred and/or will incur in order to effectively remedy their vehicles' problems related to the Defects. Defendant has been provided notice of the issues raised in this Count, as detailed above.

81.     Given the latent nature of the Defects and Defendant's concealment of the Defects, any limitations period that would otherwise bar the claims of Plaintiff or the other Class and Subclass members should be tolled.

## COUNT IV: Fraudulent Concealment
### (on behalf of Plaintiff and the Class and Subclass)

82.     Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

83.     Defendant intentionally misrepresented, concealed, omitted and/or suppressed material facts concerning the quality of its Ford F-150 vehicles and the design and production processes, including those of Defendant's aluminum hoods, exterior vehicle paint, and paint primers, as well as the existence of the Defects from Plaintiff and the Class and Subclass members.

84.     Despite advertising its Ford F-150 vehicles as tough, durable and being of high quality, Defendant knew when it manufactured, marketed, and sold or leased the Ford F-150 vehicles that the vehicles suffered from design and/or manufacturing defects, including the Defects discussed herein, that reduced the Ford F-150 vehicles' value and subjected the Ford F-150 vehicles to premature corrosion and exterior paint bubbling, flaking, peeling, and bubbling.

85.     Defendant failed to disclose these facts to consumers at the time it manufactured, marketed, and sold or leased its F-150 vehicles and Defendant knowingly and intentionally engaged in this concealment in order to boost sales and revenue, maintain its competitive edge in the automobile market, and obtain windfall profit. Through its active concealment and/or suppression of these material facts, Defendant sought to increase consumer confidence in the Ford F-150 vehicles, and to falsely assure purchasers lessees of the same that the Ford F-150 vehicles were of sound quality and that Defendant was a reputable manufacturer that stands behind the automobiles it manufactures. Defendant engaged in this behavior to protect its profits, avoid warranty replacements, and avoid recalls that would impair the brand's image, cost it money, and undermine its competitiveness in the automobile industry.

86.     Defendant intended to induce Plaintiff and the Class and Subclass members to purchase its Ford F-150 vehicles and to purchase them at a higher price than Plaintiff and the Class and Subclass members would have paid had the defect been disclosed, and Defendant continues to misrepresent, conceal and/or omit material facts in an effort to avoid being responsible for remedying the Defects. When confronted by consumers with complaints regarding the Defects, Defendant developed and implemented a concerted plan to respond with denial, refusing to appropriately fix any of the vehicles.

87.     Defendant had a duty to disclose, rather than conceal and suppress, the full scope and extent of the Defects because:

(i)     Defendant had exclusive or far superior knowledge of the Defects and concealment thereof, given that it and/or its agents (1) designed and manufactured the aluminum hoods of the vehicles, (2) manufactured, selected, tested, and/or applied the vehicles' exterior paint and/or paint primer, and (3) manufactured, distributed and/or supplied the vehicles to consumers;

(ii)    Defendant knew the facts regarding the Defects, and the concealment thereof was known and/or accessible only to Defendant;

(iii)   Defendant knew that Plaintiff and the Class and Subclass members did not know about, or could not reasonably discover, the Corrosion Defect and concealment thereof; and

(iv)    Defendant made representations and assurances about the qualities of the Ford F-150 vehicles and about the existence of a repair for the Defects.

88.     These omitted and concealed facts were material because a reasonable consumer would and did rely on them in deciding to purchase or lease the Ford F-150 vehicles, and because they substantially reduced the value of the Ford F-150 vehicles purchased or leased by Plaintiff and Class and Subclass members. Whether the Ford F-150 vehicles were defective or were durable and of sound quality, and whether Ford stood behind such Ford F-150 vehicles, would have been an important factor in Plaintiff's and the Class and Subclass members' decisions to purchase or lease the Ford F-150 vehicles. Plaintiff and Class members trusted Ford not to sell them vehicles that were defective and significantly overpriced.

89.     Defendant intentionally and actively concealed and suppressed these material facts to falsely assure consumers that their Ford F-150 vehicles were free from known defects, as represented by Ford and reasonably expected by consumers. Plaintiff and the Class and Subclass

24

members were unaware of these omitted material facts and would have paid less for the Ford F-150 vehicles, or would not have purchased/leased them at all, if they had known of the concealed and suppressed facts.

90.    Plaintiff and the Class and Subclass members did not receive the benefit of their bargain due to Defendant's fraudulent concealment. Plaintiff's and the Class and Subclass members' actions in purchasing the Ford F-150 vehicles were justified because Defendant was in exclusive control of the material facts concerning the Defects, and such facts were not known or reasonably knowable to the public, Plaintiff, or the Class and Subclass members.

91.    Plaintiff and the Class and Subclass members relied to their detriment upon Defendant's fraudulent misrepresentations and material omissions regarding the quality, durability, and high resale value of the Ford F-150 vehicles.

92.    As a direct and proximate result of Defendant's deceit and fraudulent concealment, including its intentional suppression of true facts, Plaintiff and the Class and Subclass members suffered injury. They purchased and leased Ford F-150 vehicles that had a diminished value by reason of Defendant's concealment of, and failure to disclose, the Defects.

93.    Accordingly, Defendant is liable to the Class and Subclass for their damages in an amount to be proven at trial.

94.    On information and belief, Defendant has still not made full and adequate disclosure and continues to defraud Plaintiff and the Class and Subclass members. Defendant also continues to conceal material information regarding the Defects.

95.    Defendant's wrongful acts alleged herein were intentional and malicious and were taken with the intent to mislead and defraud. As such, Plaintiff and the Class and Subclass members are entitled to punitive and exemplary damages.

## COUNT V: Unjust Enrichment
### (on behalf of Plaintiff and the Class and Subclass)

96.     Plaintiff incorporates by reference Paragraphs 1 through 51 as though fully set forth herein.

97.     Plaintiff brings this unjust enrichment claim in the alternative, to the extent the Court finds that there was no express or implied warranties or contracts between Plaintiff and/or the Class and Subclass members, on the one hand, and Defendant, on the other hand.

98.     Defendant has received millions of dollars in revenue from the sale of the Ford F-150 vehicles during the relevant time period.

99.     This revenue was a benefit conferred upon Defendant by Plaintiff and the Class and Subclass members.

100.    Defendant manufactured, marketed, and sold defective Ford F-150 vehicles to Plaintiff and Class members, while actively concealing the vehicles' known Defects and touting their quality, durability, and high resale value.

101.    Defendant knew of the Defects in its Ford F-150 vehicles at the time the vehicles were distributed to Ford dealerships and at the time the vehicles were sold to Plaintiff and the other Class and Subclass members.

102.    Despite having knowledge of the Defects, Defendant failed to disclose the existence of the Defects to Plaintiff and the other Class and Subclass members at or prior to the time of the sale of the vehicles and has failed to conduct any product recall or otherwise notify purchasers or potential purchasers of the defect.

103.    As a result of its failure or refusal to disclose the existence of the Defects, as set forth above, Defendant was able to, and did, charge a higher price for its Ford F-150 vehicles than what the vehicles' true value should have been, such that Defendant obtained monies that rightfully

belong to Plaintiff and the other Class and Subclass members. Defendant has received a measurable benefit as a result of its wrongful practices.

104.    Plaintiff and Class and Subclass members elected to purchase or lease the Ford F-150 vehicles based on Defendant's misrepresentations, deception, and omissions. Defendant knew and understood that it would (and did) receive a financial benefit, and voluntarily accepted the same, from Plaintiff and Class and Subclass members when they elected to purchase or lease the Ford F-150 vehicles.

105.    The Ford F-150 vehicles' Defects, and Ford's concealment of the same, enriched Defendant beyond its legal rights by securing through deceit and falsehood millions of dollars in revenues.

106.    Ford accepted and retained non-gratuitous benefits conferred by Plaintiff and the other Class and Subclass members, who, without knowledge of the defect, paid a higher price for their Ford F-150 vehicles than their actual lower value. Plaintiff and other Class and Subclass members did not confer these benefits officiously or gratuitously, and it would be inequitable and unjust for Defendant to retain these wrongfully-obtained profits.

107.    Therefore, because Defendant will be unjustly enriched if it is allowed to retain the revenues obtained through falsehoods, deception, and misrepresentations, Plaintiff and each Class and Subclass member are entitled to recover the amount by which Ford was unjustly enriched at his or her expense.

108.    Plaintiff and other Class and Subclass members are therefore entitled to restitution in an amount to be determined at trial.

109.    Accordingly, Plaintiff, on behalf of herself and each Class and Subclass member, seeks damages against Defendant in the amounts by which it has been unjustly enriched at

Plaintiff's and each Class and Subclass member's expense, and such other relief as this Court deems just and proper.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, respectfully requests that this Court enter a judgment against Defendant for the following relief:

1.    An order certifying the Class and/or Subclass as defined above;

2.    A declaration that Defendant breached its express and implied warranties, both through Magnuson-Moss and through common law, to Plaintiff and the Class and/or Subclass members;

3.    Notification to all Class and/or Subclass members about the Defects and Defendant's inaccurate and incomplete representations;

4.    An order awarding to Plaintiff and the Class and/or Subclass actual, compensatory, and punitive damages, as proven at trial;

5.    An order awarding Plaintiff and the Class and/or Subclass members restitution, disgorgement, or such other equitable relief as the Court deems proper;

6.    An order awarding Plaintiff and the Class and/or Subclass reasonable attorneys' fees, costs, and pre- and post-judgment interest;

7.    An injunction barring Defendant from continuing to distribute, supply, market, and sell its Ford F-150 vehicles containing the Defects as fit for their ordinary purposes until Defendant has remedied the defects complained of; and

8.    An award to Plaintiff and the Class and/or Subclass of such other and further relief as may be determined to be just, equitable and proper by this Court.

## JURY DEMAND

Plaintiff hereby demands trial by jury on all issues so triable in this action.

Dated: October 21, 2019

Respectfully submitted,

TINA NELSON, individually and on behalf of a class of similarly situated individuals

By: /s/ Edwin E. Wallis III
    *One of Plaintiff's Attorneys*

ROBERT A. COX (TN #14279)
EDWIN E. WALLIS III (TN #23950)
GLASSMAN, WYATT, TUTTLE & COX, P.C.
26 North Second Street
Memphis, TN 38103
Tel: 901-527-4673
Fax: 901-527-5320
Email: rcox@gwtclaw.com
Email: ewallis@gwtclaw.com

Myles McGuire (*pro hac vice to be filed*)
Evan M. Meyers (*pro hac vice to be filed*)
Timothy P. Kingsbury (*pro hac vice to be filed*)
MCGUIRE LAW, P.C.
55 W. Wacker Dr., 9th Fl.
Chicago, IL 60601
mmcguire@mcgpc.com
emeyers@mcgpc.com
tkingsbury@mcgpc.com

*Counsel for Plaintiff and the putative Class members*